UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN
DIVISION

| | |
|---|---|
| ALEXANDRA BETZEL, RONALD REED, SARA ENGIMANN, MILES BENNET HOGERTY,<br>　　　　　Plaintiffs,<br><br>v.<br><br>CHICAGO POLICE OFFICERS ANGELO GALLEGOS (#14570), MICHAEL WILSON (#17643), DAVID FLOYD (#13262), CHRISOTPHER BIELFEDLT (#63), SHEAMUS MANNION (#115), SUPERINTENDENT DAVID BROWN, and CITY OF CHICAGO,<br>　　　　　Defendants. | Case No. 1:23-cv-02247<br><br>Judge Sharon Johnson Coleman<br><br>Magistrate Judge Jeffrey T. Gilbert |

**PLAINTIFFS' RESPONSE TO CITY OF CHICAGO AND SUPERINTENDENT BROWN'S PARTIAL MOTION TO DISMISS
<u>PLAINTIFF'S AMENDED COMPLAINT</u>**

**INTRODUCTION**

During the summer of 2020, millions of people throughout the world took part in protests against police brutality and racism. Second Am. Compl. ¶ 1. Plaintiffs Alexandra Betzel, Ronald Reed, Sara Engimann, and Miles Bennett Hogerty joined one of these protests in downtown Chicago on May 30, 2020, and sustained serious injuries after Chicago Police Department (CPD) Officers unlawfully beat and brutalized each Plaintiff and falsely arrested Plaintiffs Reed, Engimann, and Hogerty. *Id.* ¶¶ 43-106. In addition to their claims against the Defendant Officers, Plaintiffs allege that the harms they suffered resulted directly from the City of Chicago's and CPD's *de facto* policies and practices, including, but not limited to, using unjustified and often

lethal force against protesters, retaliating against protesters who speak out against police violence, engaging in false and retaliatory arrests, failing to adequately train officers to respond to protests, and failing to hold accountable officers who engage in policy violations and unlawful conduct. *Id.* ¶¶ 198. Plaintiffs also assert that Superintendent Brown failed to intervene to protect them from the injuries they suffered at the hands of CPD officers. *Id.* ¶¶ 203-206. The City of Chicago and Superintendent Brown moved to dismiss these claims—arguing that the Plaintiffs failed to allege deliberate indifference as required by *Monell.* because, at the time of the 2020 protests, Defendant City of Chicago was subject to a Consent Decree. Def. Mot. to Dismiss at. 6-10.

There is no legal support for the City's position, and for good reason. If the City's argument held water, a *Monell* Defendant could prevail by simply promising to change—even if the promised changes never materialize. No court has endorsed the City's view that the act of agreeing to a Consent Decree creates a protective barrier against *Monell* liability. To the contrary, in numerous cases in this District and other circuits, federal courts have allowed *Monell* claims to proceed even when defendants are subject to consent decrees.[1] The Court should therefore reject this argument, untethered as it is from law and common sense.

Superintendent Brown further argues that Plaintiffs failed to sufficiently plead that his actions caused Plaintiffs' injuries. *Id.* at 12-14 . But Defendant Brown's attempts to avoid liability for his officers' unlawful actions ignore the detailed allegations in Plaintiff's complaint. Plaintiffs allege that Defendant Brown had knowledge that—during the protest Plaintiffs attended—his officers were engaged in widespread abusive conduct. Despite having this knowledge, Defendant

---

[1] *See, e.g.*, *Fix v. City of Chicago*, Nos. 21-cv-2843 and 21-cv-2846, 2022 WL 93503, at *2–4 (N.D. Ill. Jan. 10, 2022); *Hendrick v. Bryant*, No. 20-cv-00249, 2021 WL 4502159, at *4 (N.D. Ill. Sept. 30, 2021); *Howard v. Sheriff of Cook Cnty.*, No. 15 C 9384, 2016 WL 4366598 (N.D. Ill. Aug. 16, 2016); *Widmaier v. City of Newark*, No. 16-2533, 2019 WL 1895087, at *4 (D.N.J. Apr. 29, 2019); *Phillips v. Bratton*, No. 07-873, 2008 WL 11409876, at *2–3 (C.D. Cal. Jan. 28, 2008).

Brown failed to stop his officers from violating Plaintiffs' constitutional rights. Second Am. Compl. ¶¶ 203-207. These allegations are more than sufficient to permit Plaintiff's *Monell* and failure to intervene claims against Superintendent Brown to proceed.

## SUMMARY OF FACTUAL ALLEGATIONS

Plaintiff's complaint alleges that CPD's response to the summer 2020 protests was consistent with CPD's long-standing policies and practices of using abusive tactics and excessive force against protesters seeking progressive social and political change. Second Am. Compl. ¶ 7. CPD's violence and brutality against protesters is also consistent with CPD's widespread policy and practice of using aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. *Id.* ¶121. CPD has maintained its widespread practice of using excessive force for well over 100 years through promoting the "code of silence" and the failure to discipline Chicago police officers who engage in misconduct. Id. ¶139-152. CPD's widespread practices of using excessive force and the code of silence have been documented and acknowledged by government reports, including the Chicago Police Accountability Task Force (PATF) Report and the Department of Justice (DOJ) Report, by City officials, including the Mayor and Superintendent of Police, and by the federal courts. Id. ¶153-156. CPD's systemic violations against protesters at the summer 2020 protests occurred despite the City and CPD being subject to the Consent Decree for almost two years. Id. ¶ 8. The Consent Decree contains provisions that should have remedied the policy and practice violations described in the complaint, but CPD has entirely failed to conform its practices to Consent Decree mandates. Id. ¶ 132.

Defendant Superintendent Brown, who is responsible for the general management and control of CPD, made all command decisions about the CPD's systematic response to the summer 2020 protests and authorized and directed the officers' unlawful conduct. Id. ¶ 39. Superintendent

Brown encouraged and permitted CPD officers to target, attack, and harass protesters with violent animus and took no action to halt CPD officers' systemic violence against the protesters. Id.

## STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits." *Chatman v. City of Chicago*, 2015 WL 1090965, at *4 (N.D. Ill. Mar. 10, 2015). To survive a 12(b)(6) motion, a complaint must "state a claim that is plausible on its face." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To determine whether Plaintiff has met this standard, the Court "takes all well-pleaded allegations of the complaint as true and views them in the light most favorable to the plaintiff." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000)).

## ARGUMENT

### I. Plaintiff Has Properly Alleged a *Monell* Claim Against the City of Chicago and Superintendent Brown (Count VIII)

Defendants seek dismissal of Count VIII, contending that Plaintiffs have failed to plausibly allege that the City or Superintendent Brown were deliberately indifferent to her constitutional rights. Defs.' Mot. to Dismiss at 7-12.

To state a Section 1983 claim against the City and Superintendent Brown in his official capacity under *Monell,* Plaintiffs must allege that they suffered injuries caused by the Chicago Police Department's official policies or customs. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Additionally, to demonstrate that the City is liable for a harmful practice or custom, Plaintiffs

must show that the City's policymakers were "deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). In other words, Plaintiffs must show that the City "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect [Plaintiff]." *Id.*

> **A. Plaintiffs properly alleged that CPD's widespread practices caused their injuries and that the City and Superintendent Brown were deliberately indifferent.**

Plaintiff may demonstrate a widespread practice by alleging "a series of violations to lay the premise of deliberate indifference." *Id.* In "widespread practice" implicit policy cases, "what is needed is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome," a court can "infer that there is a policy at work, not [an] isolated incident." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

Defendants attempt to defeat Plaintiffs' *Monell* claim by arguing that "the City's ongoing efforts to reform Department's policies and practices through the Consent Decree demonstrate a deliberate intention to remedy the kinds of violations Plaintiffs allege." Def. Mot. to Dismiss at 8. Defendants maintain that because the City of Chicago voluntarily entered into the CPD Consent Decree, they cannot have been deliberately indifferent to the risk of harm posed by CPD's unconstitutional policies and practices. *Id.* Essentially, the City argues that "the Consent Decree's very existence" dooms Plaintiffs' *Monell* claim. *Id*. at 10.

But this is not the law. The Consent Decree (and the City's failure to comply with the vast majority of its provisions) are powerful evidence that the City has long been on notice regarding CPD's policy and practice failures and has failed to take action to remedy these violations. Am.

Compl. ¶¶ 133-138. The City argues that merely because it has paid lip service to an "ongoing commitment to police reform," it cannot be found deliberately indifferent to the harm Plaintiff suffered as a result of CPD's policies and practices. Defs.' Mot. to Dismiss 8. In doing so, the City urges this Court to contravene voluminous precedent allowing *Monell* claims to proceed during the pendency of a consent decree. *See, e.g.*, *Howard*, 2016 WL 4366598, at *4 (denying motion to dismiss *Monell* claim while Cook County Jail consent decree was in effect); *Widmaier*, 2019 WL 1895087, at *4 (denying motion to dismiss *Monell* claim against City of Newark while Newark Police Department consent decree was in effect); *Phillips*, 2008 WL 11409876, at *2–3 (denying motion in limine seeking to exclude evidence concerning Los Angeles's Police Department's past "scandals" and consent decree, which were relevant to *Monell* claim); *Bennett v. Serpas*, No. 15-3087, 2017 WL 2778109, at *2 (E.D. La. June 26, 2017) (denying in part motion for judgment on the pleadings concerning *Monell* claim while New Orleans Police Department consent decree was in effect). This Court should decline the City's invitation to do so and rule in accordance with long-established case law. *See Fix*, 2022 WL 93503, at *2–4 ("Because Chicago Police Officers have continued to use excessive force, even after the City's efforts to remedy the situation, there is a reasonable inference that the City's actions to combat this unlawful conduct have been inadequate.").

      Defendants argue that *Monell* claims are "less plausible" as a result of the Consent Decree because "the City has made a voluntary and binding commitment to undertake an expensive and years-long process of police reform." Defs.' Mot. to Dismiss 8. But the mere existence of the Decree is not, in and of itself, evidence of a remedy or reform. The City would have to *actually comply* with the terms of the Consent Decree and implement substantive reforms to correct its unconstitutional conduct—and Plaintiff alleges that, at the time of the events in question, the

CPD entirely failed to comply with relevant Consent Decree provisions. Second Am. Compl. ¶¶ 133-138. *See Hendrick*, 2021 WL 4502159, at *4 (allowing a *Monell* claim to proceed where allegations asserted that "the defendant municipality had knowledge of a problem with its policies, agreed to remedy the problem, and then failed to remedy the problem.").

Specifically, Plaintiffs allege that CPD's widespread unconstitutional practices continue to occur despite the City and CPD being subject to a Consent Decree for almost two years. Am. Compl. ¶¶ 133-138. Plaintiffs allege that the City's missed deadlines and non-compliance with the Consent Decree bore directly on CPD's civil rights abuses at the summer 2020 protests. *Id.* ¶ 134. Plaintiffs allege that CPD failed to create adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies. *Id* .¶ 136. Plaintiffs allege that CPD's documented failure to comply with the Consent Decree deadlines coupled with its illegal and violent response to the summer 2020 protests demonstrate that the Consent Decree has entirely failed to create any meaningful change in CPD. *Id.*¶ 138. Therefore, based on Plaintiffs' allegations, it is reasonable to infer that the City's Consent Decree failures demonstrate an ongoing deliberate indifference to the unconstitutional police conduct at issue here because the City eschewed its obligations under the Consent Decree and continued its unconstitutional practices.

Moreover, contrary to Defendants' argument that the Consent Decree defeats *Monell* liability, other courts in this District have recognized that the CPD Consent Decree in fact supported plaintiffs' *Monell* claims. *See, e.g.*, *Hendrick*, 2021 WL 4502159, at *4 (finding that plaintiff sufficiently pleaded a *Monell* claim where he alleged that "the City, under the consent decree, was required to clarify in its policy on when it is appropriate for police officers to point guns at people, to train its officers regarding that policy, and to ensure that such actions are

documented," and that the City was ordered to implement those reforms months before officers stopped the plaintiff and pointed their weapon at him); *Mendez*, 2019 WL 4934698, at *2-3 (finding that plaintiff plausibly alleged a *Monell* claim where plaintiff cited to the Consent Decree, the PATF Report, and the DOJ Report as evidence that the City engaged in a practice of sanctioning uses of force during foot pursuits).

Defendants argue that case law supports their contention that the existence of the Consent Decree defeats the *Monell* claims here. Defs.' Mot. to Dismiss 8-11. But *no* Court has ever made such a ruling. Defendants assert that the court in *Taylor v. City of Chicago*, "rejected claims nearly identical to those Plaintiff raises here." *Id.* 8. However, Defendants wholly misrepresent the holding in *Taylor*. There, the court noted that government reports—including the DOJ Report and the Independent Monitoring Report on the Consent Decree—could "buttress a *Monell* claim." *Taylor v. City of Chicago*, No. 21 C 2197, 2021 WL 4523203, at *2 (N.D. Ill. Oct. 4, 2021). But, unfortunately for the *Taylor* Plaintiff, the DOJ and PATF report were not included in his complaint, but instead cited in a response to the City's Motion to Dismiss. *Id.*

Further, the *Taylor* plaintiff failed to connect the dots between his injuries, the government reports and the City's ongoing non-compliance with the consent decree. In fact, the court characterized Taylor's allegations as "conclusory." *Id.* That is simply not this case. Here, Plaintiffs' complaint summarizes the DOJ and PATF reports about CPD's policies and practices and also includes Consent Decree-related Monitor reports about the City's compliance failures. Second Am. Compl. ¶¶ 153-156. Plaintiffs explicitly and in a detailed manner connects these reports and the City's ongoing Consent Decree compliance failures to his injuries. The *Taylor* complaint failed for its lack of detail. Plaintiff's complaint here has no such deficits. *Taylor* stands for the proposition that complaints must do more than "merely recite elements of the claim" and

asserts that Plaintiffs must provide "enough factual details to present a story that holds together." *Taylor*, 2021 WL 4523203, at *4. That is precisely what Plaintiffs' complaint does. *see Treadwell*, 2021 WL 3129290, at *6 (denying motion to dismiss Monell claim where plaintiff connected harm he experienced to allegations about City's unconstitutional patterns and practices).

Defendants' reliance on *Anderson v. Allen* is also misplaced. Defs.' Mot. to Dismiss 9. In *Anderson*, a Plaintiff asserting a false arrest-related *Monell* claim attempted to rely on reports regarding CPD's investigatory stops—but not false arrests. Because the Plaintiff failed to plead sufficient facts connecting CPD's investigatory stop practices to those related to false arrests, the court dismissed Plaintiff's *Monell* claim. *Anderson v. Allen*, No. 19-cv-2311, 2020 WL 5891406, at *3 (N.D Ill. Oct. 5, 2020). The *Anderson* court noted in a footnote that even if it considered the investigatory stop reports relevant to a false arrest *Monell* claims, Plaintiff's claim would fail because the reports at issue demonstrated that CPD had "drastically reduced and reformed" investigatory stop practices. *Id.* Here, conversely, Plaintiffs refer to provisions in several government reports that directly relate to and support his allegations that CPD's unconstitutional widespread practices that caused his injuries during the summer 2020 protests. Second Am. Compl. ¶¶ 153-156. Plaintiffs rely upon Consent Decree related reports that demonstrate CPD's ongoing failures to comply with constitutional mandates and connects those failures to his injuries. *Id.* at 135, 156. And prior to the Summer of 2020, no Consent Decree related report contained evidence of "drastic reform" that undermined the *Anderson* Plaintiff's claims. *Id* at ¶¶ 132-133. In short, no case law supports the contention that a defendants' promise to change can defeat a *Monell* claim.[2]

---

[2] Defendants cite a few other district court decisions dismissing *Monell* claims, but those cases are inapposite for a variety of reasons. *See, e.g.*, *Czosnyka v. Gardiner*, 21-CV-3240, 2021 WL 4951517, at *2 (N.D. Ill. Oct. 25, 2021) (dismissing the plaintiffs' *Monell* claim because plaintiffs did not have Article III standing to bring lawsuit against the City); *Carmona v. City of Chicago*, 15-CV-00462, 2018 WL 1468995, at *4 (N.D. Ill. Mar. 26, 2018) (granting the

Defendants also cherry pick from the complaint to point at material which, in their view, provides evidence of the City's "ongoing commitment to police reform" and defeats Plaintiffs' Monell claim. Defs.' Mot. to Dismiss at 9-10. In doing so, Defendants transparently invite this Court to draw inferences against Plaintiffs, and thus their arguments must be rejected. See *Treadwell v. Salgado*, 2021 WL 3129290, at \*6 (N.D. Ill. July 23, 2021) (rejecting argument that City's reforms defeated plaintiff's *Monell* claim as inappropriate at the motion to dismiss stage, and concluding complaint read as a whole sufficiently alleged a *Monell* claim). For instance, Defendants cite to the creation of a COPA investigation team that investigated complaints arising out of the 2020 protests and highlight the handful of officers that team has referred for discipline. Id. at 9 (citing Second Am. Compl. ¶ 37). Defendants conveniently ignore the remainder of Plaintiffs' allegation, which alleges that the complaints that resulted in discipline represent a miniscule fraction of the total number, supporting rather than undermining Plaintiffs' allegations regarding the ongoing pattern and practice of failing to discipline officers who violate protesters' constitutional rights. *Id*. ¶ 34. Defendants also selectively pluck quotes from a speech delivered by Defendant Superintendent Brown, id. at 9 (citing *Id*. ¶ 41), disregarding the portions of that speech cited in Plaintiffs' complaint in which Defendant Brown confirmed the continuing existence of the code of silence and recognized the Department's ongoing problems with holding officers accountable. *Id.* ¶ 41.

---

City's motion to dismiss the plaintiff's *Monell* claim because the plaintiff's allegations were bare and conclusory and he did not allege how the deficiencies described in the DOJ report—which he simply attached to his response brief and did not reference in his complaint—related to his claim that police officers illegally handcuffed and interrogated him in a hospital bed and arrested him without probable cause); *Sanchez v. Garcia*, 12 C 06347, 2015 WL 2097606, at \*4 (N.D. Ill. May 4, 2015) (dismissing plaintiff's *Monell* claim at the summary judgment stage).

Finally, Defendants argue Plaintiffs' deliberate indifference allegations merely allege that "the City and the Department have not yet eradicated all alleged instances of constitutional violations in policing." Defs.' Mot. to Dismiss 10. This assertion seriously mischaracterizes Plaintiffs' complaint. Beyond the Consent Decree related allegations, Plaintiffs also allege that CPD's "unconstitutional practices against protesters continued throughout history," long before the Consent Decree. Second Am. Compl. ¶¶ 7, 119-120.[3] Courts in this District regularly find that these sorts of historical allegations are sufficient to carry a Plaintiff's burden.[4] *See Savory v. Cannon*, 532 F. Supp. 3d 628, 639–40 (N.D. Ill. 2021) (relying on historical allegations regarding instances of coerced confessions and fabrication of evidence to deny the defendants' motion to dismiss plaintiff's *Monell* claim against the Peoria Police Department.); *Hill v. Cook County*, 463 F. Supp. 3d 820, 843 (N.D. Ill. 2020) (denying a motion to dismiss when a plaintiff relied on evidence from 1978—twenty-seven years before the allegations in the complaint—to buttress *Monell* claims against the Cook County Sheriff's Department for a practice of suppressing and manufacturing evidence).[5]

---

[3] These historical allegations include facts regarding CPD's unlawful and violent response to: 1) the mass demonstration against the War in Iraq in 2003; 2) an anti-deportation demonstration in 2011 and 3) the 2016 protests against then presidential candidate Donald Trump.

[4] *See also In re New York City During Summer 2020 Demonstrations*, No. 20-cv-8924, 2021 WL 2894764, at *9 (S.D.N.Y. July 9, 2021) ("Plaintiffs identify a number of police practices that were allegedly wrongfully used or abused during the BLM protests and pleads facts from which it could be inferred that this was not some 'one off' instance of misuse of these practices, but had been part and parcel of the NYPD's 'arsenal' for dealing with political protests for that past two decades. That sufficiently pleads a custom or policy of using excessive force and making false arrests at large protests throughout New York City."); *cf. Keyes v. School Dist. No. 1*, 413 U.S. 189, 198–99 (1973) (referencing almost ten years of a school district's history of segregation to affirm findings that a district engaged in a pattern and practice of unlawful segregation).

[5] Further, Plaintiffs allege that numerous government reports put the Defendants on notice about CPD's long and well-documented history of excessive force. Second Am. Compl. ¶¶ 121-132) (summarizing the findings of the Police Accountability Task Force and the U.S. Department of Justice Investigation of the Chicago Police Department). Multiple courts have found that these reports bolster a plaintiff's *Monell* burden at the Motion to Dismiss stage. See *Arrington v. City of Chicago*, No. 17-C-5345, 2018 WL 620036, at *4 (N.D. Ill. Jan. 30, 2018) ("In this case, where Plaintiff alleges that the City enables or condones a custom or practice of excessive force among its police officers,

As noted by Judge Dow in his order approving the Decree: "the consent decree is not a panacea, nor is it a magic wand. . . As a consequence, the Court's ongoing authority lies largely in contract enforcement rather than in fashioning remedies for violations of federal law." *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.) (Dkt. No. 702). Despite Judge Dow's warnings to the contrary, implicit in Defendants' arguments is the assertion that the Consent Decree is indeed a magic wand that erases the City's *Monell* liability. The Consent Decree does no such thing. Instead, as described by the Plaintiffs here, the Decree represents Defendants' broken promises. Second Am. Compl. ¶133. Accordingly, Plaintiffs' *Monell* claim against the City and Superintendent Brown should not be dismissed because Plaintiff has sufficiently alleged that the City and Superintendent Brown were deliberately indifferent to the widespread unconstitutional practices within CPD that caused Plaintiffs' injuries.

### B. Plaintiffs properly allege a theory of *Monell* liability based on the actions of Superintendent Brown as a final policymaker.

Plaintiffs have also alleged facts that plausibly suggest that their constitutional injuries were caused by Superintendent Brown's actions or inaction. Plaintiffs allege that Superintendent Brown, through actions both explicit and implicit, authorized and directed the officers' unlawful conduct at the summer 2020 protests. Am. Compl. ¶ 36. Plaintiffs allege that Superintendent Brown encouraged and permitted CPD officers to target, attack, and harass protesters with violent animus and took no action to halt CPD officers' systemic violence against the protesters. *Id.* Plaintiffs further allege that Superintendent Brown maintained the widespread practices of CPD officers using excessive force and falsely arresting protesters and was deliberately indifferent to

---

the DOJ report citing evidence that such a custom or practice does in fact exist is a sufficient basis for Plaintiff's *Monell* claim to proceed."); *Taylor v. Norway*, 2021 WL 4133549, at *4 (N.D. Ill. Sept. 10, 2021). (finding that, "in the context of the entire complaint, the allegations about [the DOJ report] are appropriate to support Plaintiff's *Monell* claim).

Plaintiffs' constitutional rights. *Id.* ¶ 204. Plaintiffs allege that Superintendent Brown was deliberately indifferent to the need for further officer training, supervision, and discipline related to the use of force against protesters. *Id.* ¶ 206.

Defendants do not dispute that Superintendent Brown was the final policymaker for CPD's response to the summer 2020 protests. Instead, Defendants contend that "by alleging that Superintendent Brown as the final policymaker directly violated the City's policies, Plaintiff fails to state a basis for *Monell* liability." Defs.' Mot. to Dismiss at 11-12. Defendants' argument misses the mark. The operative policies here are not the provisions of the Consent Decree. Plaintiffs have clearly alleged that the City and CPD have failed to comply with the Consent Decree and as a result have demonstrated deliberate indifference. Second Am. Compl. ¶¶ 133-138. Plaintiffs allege that—despite the Consent Decree's existence during the summer 2020—Superintendent Brown maintained and encouraged CPD's widespread unconstitutional practices at protests. *Id.*. Thus, Superintendent Brown did not, as Defendants suggest, directly violate the City's policies. Rather, Superintendent Brown was in fact implementing CPD's widespread *de facto* policies and practices that caused Plaintiffs' injuries.

Defendants' reliance on *Lanahan v. County of Cook* is misplaced. Defs' Mot. to Dismiss at 20–21 (citing 2018 WL 1784139 (N.D. Ill. Apr. 13, 2018)). The court in *Lanahan* dismissed the plaintiff's *Monell* final policymaker claim because Plaintiff, who alleged she suffered employment related retaliation, failed to sue the individual with final policymaking authority for the County and alleged that her harms resulted from an *individual's* failure to comply with the *Shakman* consent decree (which prohibited political discrimination and retaliation in employment). *Id.* at *12. Here, by contrast, Plaintiffs are not merely alleging that Superintendent Brown as an individual has "run afoul" of the Consent Decree, but rather that he encouraged and

maintained—as the final policymaker—unconstitutional policies and practices within CPD that also happen to be in defiance of the Consent Decree. And it was those unconstitutional policies and practices that Superintendent Brown furthered and implemented during the summer 2020 protests that caused Plaintiffs' injuries. *See Vodak v. City of Chicago,* 639 F.3d 338, 748 (7th Cir. 2011) (concluding, in case arising out of CPD's unconstitutional actions in response to 2003 protests against the Iraq War, that "[a]ll that matters in this case is that Chicago's police superintendent has sole responsibility to make policy regarding control of demonstrations. He was in his headquarters throughout the March 20, 2003, demonstration, not only monitoring it but also approving the decisions of his subordinates. . . . The superintendent *was* the City, so far as the demonstration and arrests were concerned."). Accordingly, Plaintiffs' *Monell* claim against the City and Superintendent Brown in his official capacity based on the final policymaker theory should proceed.

## II. Plaintiffs Properly Alleged a Failure to Intervene Claim Against Superintendent Brown (Count VI)

Defendants seek dismissal of Count VI, contending that Plaintiffs' allegations are generic and inadequate to support a claim for failure to intervene against Superintendent Brown. Defs.' Mot. to Dismiss at 14. Defendants' contention must be rejected.

To state a failure to intervene claim, Plaintiffs must allege that Superintendent Brown: (1) had reason to know that officers were using excessive force or committing constitutional violations; and (2) "had a realistic opportunity to intervene to prevent the harm from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). "A 'realistic opportunity' means a chance to warn the officer using excessive force to stop." *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014). Further, when plaintiffs allege systemic abuse by officers that is well-known by supervisors, those supervisors can be held

liable for failing to intervene to stop the systemic abuse. *See, e.g., Smith v. Burge*, 222 F. Supp. 3d 669, 687 (N.D. Ill. 2016)(finding that supervisors who "had knowledge of the systemic torture leading to coerced confessions of innocent individuals, but nevertheless condoned it or turned a blind eye to it" could be held liable for failing to intervene to prevent officers from continuing the coercing interrogations and torture tactics; the "fact that [the supervisors] were not at Area 2 at the time of Plaintiff's torture and coerced confession does not absolve these Defendants under Plaintiff's theory of liability"); *see also Baker v. City of Chicago*, 483 F. Supp. 3d 543, 559 (N.D. Ill. 2020) (refusing to dismiss plaintiffs' failure to intervene claim where plaintiffs "have plausibly alleged that Defendant Officers and Defendant Supervisory Officers had the opportunity to put a stop to the misconduct by refusing to participate or cover it up, by disciplining the responsible officers, or by seeking outside help . . . [y]et they failed to do so").

As explained above, Plaintiffs allege that Superintendent Brown was well aware of the widespread practices of CPD officers using excessive force against protesters, that he maintained and encouraged those practices at the summer 2020 protests, and that he took no action to halt the officer's systemic use of violence against protesters. Second Am. Compl. ¶¶ 205. Thus, even if Superintendent Brown was not physically present at the protest where Plaintiffs were injured, he is not absolved of liability for failing to intervene to stop Plaintiffs' injuries.

Further, Plaintiffs alleged facts that plausibly suggest that Superintendent Brown knew that officers under his supervision and control were using excessive force and committing constitutional violations against Plaintiffs and other protesters during the weekend of May 30, 2020. Plaintiffs allege that Superintendent Brown made all command decisions about the CPD's systematic response to protesters during the 2020 protests, and that he authorized and directed the officers' unlawful conduct at the protests. Second Am. Compl. ¶ 39. Specifically, Plaintiffs allege

that Superintendent Brown encouraged and permitted CPD officers to target, attack, and harass protesters with violent animus. *Id.* Despite Defendants' assertions to the contrary, these allegations are not generic or conclusory. Rather, it is reasonable to infer from these allegations that the constitutional violations were committed by CPD officers with not only Superintendent Brown's knowledge, but with his direction and authorization. Accordingly, Plaintiffs' failure to intervene claim against Defendant Superintendent Brown should not be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Partial Motion to Dismiss Plaintiffs' Amended Complaint.

Respectfully submitted,

/s/ Sheila A. Bedi
Sheila A. Bedi
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611-3609
312-503-8576

/s/ Nora Snyder
Nora Snyder
Brad J. Thomson, Janine Hoft,
Ben Elson, Jan Susler, Hakeem Muhammad
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
773-235-0070

/s/ Jonathan Manes
Jonathan Manes
MacArthur Justice Center
160 E. Grand Ave, 6th Fl.
Chicago, IL 60611
312-503-0012

**Counsel for Plaintiffs**